UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JONATHAN WALCZAK,<br><br>Plaintiff,<br><br>v.<br><br>DEPARTMENT OF JUSTICE *et al.*,<br><br>Defendants. | Civil Action No. 25-cv-7741 (PAE) |

**DECLARATION OF ISABEL MARIE LARA**

I, Isabel Marie Lara, declare as follows:

1. I am the Acting Section Chief of the Record/Information Dissemination Section (RIDS), Information Management Division, Federal Bureau of Investigation (FBI), located in Winchester, Virginia. I have held this position since April 2026. I joined the FBI in March 2005. Prior to my current position, I served as Acting Section Chief in the Enterprise Vetting Center (EVC) from March 2025 to April 2026, Assistant Section Chief of the EVC's Vetting Branch 1 from February 2025 to February 2026, Unit Chief of the EVC's Vetting Unit 4 from October 2020 to January 2025, Supervisory Research Analyst, Lead Research Analyst, and Research Analyst in the EVC's Vetting Unit 1 from March 2006 to October 2025, and Support Services Clerk in the San Antonio Division, Austin Resident Agency from March 2005 to March 2006.

2. In my official capacity as Acting Section Chief of RIDS, I supervise eight Federal Bureau of Investigation Headquarters units and two field operational service center units. RIDS' collective mission is to effectively plan, develop, direct, and manage responses to requests for access to FBI records and information pursuant to the Freedom of Information Act (FOIA),

5 U.S.C. § 552, as amended by the OPEN Government Act of 2007, the OPEN FOIA Act of 2009, and the FOIA Improvement Act of 2016; the Privacy Act of 1974, 5 U.S.C. § 552a; Executive Order 13526; Presidential, Attorney General, and FBI policies and procedures; judicial decisions; and Presidential and Congressional directives. My responsibilities also include the review of FBI information for classification purposes as mandated by Executive Order 13526, 75 Fed. Reg. 707 (Jan. 5, 2010) and the preparation of declarations in support of Exemption 1 claims asserted by the FBI under the FOIA. The statements contained in this declaration are based upon my personal knowledge, including information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.

3. Because of the nature of my official duties, I am familiar with the procedures followed by the FBI in responding to requests for information from its files pursuant to the provisions of the FOIA and the Privacy Act of 1974. Specifically, I am familiar with the FBI's handling of the FOIA request submitted by Plaintiff Jonathan Walczak that is the subject of this litigation.

4. The FBI submits this declaration in support of Defendant's Motion for Summary Judgment and in response to the Court's Order dated January 21, 2026. (Dkt. No. 20.) Part I of this declaration provides the Court with a summary of the administrative history of Plaintiff's request. Part II describes the procedures used to search for responsive records.

## PART I: ADMINISTRATIVE HISTORY OF PLAINTIFF'S REQUEST FBI REQUEST NUMBER NFP-1622050

5. By eFOIPA dated July 9, 2025, Plaintiff submitted a FOIA request to the FBI seeking ". . . photos developed by the FBI from a disposable camera recovered by the FBI from

the rubble of the World Trade Center after the September 11, 2001, terrorist attacks."[1] Plaintiff requested that his request be granted expedited processing pursuant to 5 U.S.C. § 552(a)(6)(E)(i)(II). To justify Plaintiff's request for expedited processing, Plaintiff stated:

> "There is an urgency here to inform the public about alleged federal government malfeasance: both how the FBI stores and catalogs physical evidence (especially, in this case, in advance of the 25th anniversary of the 9/11 attacks), and how it handles FOIA requests and denies even requests for detailed records using 'not detailed enough' and 'unduly burdensome' exemptions."

(Ex. A.)

6. By letter dated July 14, 2025, the FBI acknowledged receipt of Plaintiff's FOIA correspondence and notified Plaintiff it had assigned his request FBI Request Number NFP-1622050. The FBI informed Plaintiff that the FOIA does not require federal agencies to answer inquiries, create records, conduct research, or draw conclusions concerning queried data. Rather, the FOIA requires agencies to provide access to reasonably described, nonexempt records, and Plaintiff's request is not considered a valid FOIA request because it does not comply with the FOIA and its regulations. The FBI advised it was closing the request because it is not searchable in the FBI's indices. The FBI Central Records System (CRS) is indexed according to investigatory interests, and it is not arranged in a manner that allows for the retrieval of information in the form he requested.

7. The FBI informed Plaintiff that he could contact the FBI to ascertain how to reasonably describe his request by contacting foipaquestions@fbi.gov, or he could find additional information at www.fbi.gov/foia. Finally, the FBI advised Plaintiff that he could appeal the FBI's response to the DOJ, Office of Information Policy (OIP) within 90 days of its

---

[1] While Plaintiff's request referenced a *Baltimore Sun* article concerning the records sought, the article was not included in the original request and first came into the FBI's possession after Plaintiff submitted an appeal to the Department of Justice Office of Information Policy.

letter, contact the FBI's public liaison, and/or seek dispute resolution services by contacting the Office of Government Information Services (OGIS). (Ex. B.)

8. By email dated July 15, 2025, Plaintiff submitted an administrative appeal to DOJ, OIP challenging the FBI's determination in response to Request Number NFP-1622050. Specifically, Plaintiff challenged the FBI's determination that the records sought were not reasonably described.[2] (Ex. C.)

9. By letter dated July 15, 2025, OIP acknowledged receipt of Plaintiff's appeal of the FBI's determination in FBI Request Number NFP-1622050. OIP advised Plaintiff that it assigned it appeal number A-2025-02185. (Ex. D.)

10. On September 18, 2025, Plaintiff filed a complaint in the U.S. District Court for the Southern District of New York. (Dkt. No. 1.)

11. By letter dated September 19, 2025, OIP informed Plaintiff it was affirming the FBI's action in response to Plaintiff's Request Number NFP-1622050; therefore, OIP was closing Plaintiff's appeal. OIP advised Plaintiff that a proper FOIA request for records must reasonably describe the records sought and that Plaintiff's request was not searchable in the FBI's indices due to the request's lack of specificity. Finally, OIP advised Plaintiff that if dissatisfied with OIP's determination, Plaintiff could file a lawsuit in federal district court, and/or seek mediation services from OGIS. (Ex. E.)

12. Following the filing of the Plaintiff's lawsuit, the FBI performed additional searches in response to Plaintiff's FOIA request as detailed below.

[2] *See* n.1.

## PART II: THE FBI'S SEARCH METHODOLOGY FOR RESPONSIVE RECORDS

13. Contained in the following paragraphs are: a description of the FBI's Central Records System (CRS); the results of the FBI's CRS search for records responsive to Plaintiff's request, and an explanation of the FBI's targeted search for records responsive to Plaintiff's request.

### THE FBI'S CENTRAL RECORDS SYSTEM

14. The CRS is an extensive system of records consisting of applicant, investigative, intelligence, personnel, administrative, and general files compiled and maintained by the FBI while fulfilling its mission and integrated functions as a law enforcement and intelligence agency, and in the fulfillment of its administrative and personnel functions. The CRS spans the entire FBI organization and encompasses the records of FBIHQ, FBI field offices, and FBI legal attaché offices worldwide.

15. The CRS consists of a numerical sequence of files, called FBI "classifications," which are organized according to designated subjects. The broad array of CRS file classification categories includes types of criminal conduct and investigations conducted by the FBI, as well as categorical subjects pertaining to counterterrorism, intelligence, counterintelligence, personnel, and administrative matters. For identification and retrieval purposes across the FBI, when a case file is opened, it is assigned a Universal Case File Number consisting of three sequential components: (a) the CRS file classification number; (b) the abbreviation of the FBI office of origin (OO) opening the file; and (c) the assigned individual case file number for the particular subject matter.[3] Within each case file, pertinent documents of interest are "serialized," or

[3] For example, in fictitious file number "11Z-HQ-56789," "11Z" indicates the file classification, "HQ" indicates that FBI Headquarters is the FBI OO, and "56789" indicates the assigned case specific file number.

assigned a number in the order which the document is added to the file, typically in chronological order.

*The Central Records System's General Indices and Indexing*

16. The general indices to the CRS, comparable to a digital version of a library card catalog, function as the key to locating records within the enormous amount of information contained in the CRS. FBI personnel index information in the CRS by individual (person), organization (entity, place, or thing), or activity or event (e.g., terrorist attack or bank robbery) when information is deemed of sufficient significance to warrant indexing for future retrieval.[4] The entries in the general indices fall into two categories:

> a. Main index entry: A main index entry is created for each individual or non-individual (e.g., organization, event, or activity) that is the subject or focus of an investigation. Main subjects are identified in the case title of a file.
>
> b. Reference index entry: A reference index entry is created for an individual or non-individual (e.g., organization, event, or activity) associated with an investigation, but who or which is not the main subject or focus of the investigation. Reference subjects are typically not identified in the case title of a file.

*Sentinel*

17. FBI personnel access the general indices through Sentinel, the FBI's case management system (since July 1, 2012). Prior to Sentinel, the FBI relied on a case management system known as Automated Case Support (ACS).[5] On August 1, 2018, the FBI decommissioned

---

[4] FBI's Records and Information Management Policy mandates that FBI personnel enter all federal records into an authorized FBI recordkeeping system. FBI personnel are responsible for managing records they create and receive, determining the record status for each, and importing records into an electronic recordkeeping system such as the Sentinel case management system. *See* FBI Records and Information Management Policy Guide, 1321PG (May 31, 2024) at 11-12 (Section 2.9), available at www.vault.fbi.gov/records -and-information-management-policy-guide-1321pg/Records%20and%20Information%Management%20Policy%20Guide%201321PG%20Part%2001%28Final%29/view (last accessed March 25, 2026)

[5] As part of the ACS implementation process, over 105 million pre-existing CRS records were converted from automated systems previously utilized by the FBI into a single, consolidated case management system accessible by all FBI offices.

ACS and the ACS indexed data was migrated into Sentinel, where these indices are accessible and searchable through Sentinel's search function. In addition to providing access to the information previously indexed into ACS, Sentinel provides a means for FBI personnel to access the FBI's older manual indices, when necessary.

18. FBI personnel rely on Sentinel to locate records and other types of documents to fulfill essential functions, such as: conducting criminal, counterterrorism, and national security investigations; conducting background investigations; performing citizenship and employment queries; and administering security screenings, to include presidential protection. Sentinel's index search methodology and function allow FBI personnel to query the CRS for indexed subjects in case files.

19. Typically, FBI uses this index search function in responding to FOIA and Privacy Act requests. However, the identification of records indexed to the subject of a FOIA request does not automatically mean the indexed records are responsive. Index searches using the search functions available in Sentinel are the means by which potentially responsive records are located, but ultimately, a FOIA analyst must review potentially responsive records against the specific parameters of individual requests. Responsiveness determinations are made once indexed records are gathered, analyzed, and sorted by FOIA analysts who then make informed scoping decisions to determine the total pool of records responsive to an individual request.

*Central Records System Text Search*

20. The FBI generally does not conduct full text searches of the CRS in responding to FOIA and Privacy Act requests as this measure is usually unduly burdensome and not reasonably calculated to locate responsive records. The CRS is constructed in a way that information important to an investigation, or that may be important to the FBI in the future, is indexed (as described in ¶ 16) so that it can be easily retrieved. The system would not function as an effective

investigative tool without such indexing. For information that is not indexed—such as "disposable camera" (a term that in most instances has no continuing significance to the FBI)—conducting a text search of CRS for the term would return significant numbers of mentions, or mentions of parts of the phrase, that are not likely related to the information requested. In the FBI's experience, text searches of non-indexed terms generally return significant numbers of mere mentions to random, incomplete, or decontextualized references. The FBI then must review each mention to determine if it pertains to the requested subject matter. This takes significant amounts of time and resources but generally does not result in the FBI being able to identify the requested subject from the random references located and therefore does not result in the location of responsive material. Thus, the net result of such a search is typically a significant use of time and resources with little or no additional responsive information being identified.

21. There are, however, certain situations in which there is a benefit and utility to the FBI conducting text searches of the CRS. For example, if the FBI identifies a potential lead that indicates potential responsive records may exist, a text search of a specific case file or files within CRS may be conducted.

FBI'S SEARCHES IN CONNECTION WITH WALCZAK'S FOIA REQUEST

22. In this case, on January 28, 2026, Plaintiff provided the FBI with a list of names and entities that could be associated with the 9/11 victim from whom the disposable camera was

recovered.[6] In response, the FBI conducted a text search within PENTBOM[7], the 9/11 investigative case file, housed within Sentinel, with a search cut-off date of January 6, 2026.[8] The search specifically targeted any mention of the following named deceased individuals[9] provided by Plaintiff:

a. "Anthony Peluso"
b. "Benjamin Millman"
c. "Benny Millman"
d. "Brendan Lang"
e. "Brian Monaghan"
f. "Chris Kirby"
g. "Daniel Rosetti"
h. "John Rizzo"
i. "Joseph Mistrulli"
j. "Joseph Piskadlo"
k. "Joshua Poptean"
l. "Kieran Gorman"
m. "Manuel DaMota"

---

[6] In the January 27, 2026, email, Plaintiff's counsel detailed Plaintiff's efforts to identify the 9/11 victim, explaining that Plaintiff conducted research for the possible identity of the photographer and provided to the Government a list of individuals who were listed as employees at construction or construction-adjacent firms, were pronounced deceased at the scene, and which excluded those who were never found and/or did not match the description of the photographer. The FBI confirmed that the persons identified by Plaintiff are reflected on the victim memorial list, and it incorporated Plaintiff's request into its search for records. Beyond the identified names and descriptive information provided by Plaintiff and referenced in the *Baltimore Sun* article, the FBI has no additional leads to locate and identify responsive records.

[7] The PENTBOM case file serves as the FBI's centralized record for evidence collected in connection with the 9/11 investigation. Searches conducted within the PENTBOM file encompass all locations where evidence is stored, including holdings at field offices, Laboratory Division locations, and other repositories, to the extent that such evidence would reasonably be indexed or recorded in the case file. These would also include any evidence logs created in connection with the investigation.

[8] A search cut-off date is the date that the agency commences a search for records responsive to a FOIPA request. Generally, the FBI uses a search cut-off date to delineate the scope of a FOIPA request by treating records created after that date as not responsive to the request. *See* 28 C.F.R. § 16.4(a). The Department of Justice (DOJ) provides notice of the use of a search cut-off date in its published FOIA reference guide on its FOIA website (https://www.justice.gov/oip/doj-guide-freedom-information-act-0) (last accessed April 14, 2026).

[9] The FBI independently verified that these individuals' names were contained in the 9/11 Memorial Site list before conducting third party searches.

n. "Manuel Da Mota"
o. "Manuel Mota"
p. "Martin Coughlan"
q. "Mauricio Gonzalez"
r. "Maynard Spence"
s. "Patrick Woods"
t. "Robert Caufield"
u. "Rocco Medaglia"
v. "Sean Canavan"

Additionally, in an act of good faith, the FBI extended its search to include additional terms within the PENTBOM case file. These terms were selected based on their likelihood to identify records relevant to the camera referenced in the *Baltimore Sun* article.

a. "disposable"
b. "rubble"
c. "Laura Sullivan"
d. "FBI team puts together"
e. "The Baltimore Sun"
f. "Baltimore Sun"
g. "unit members"
h. "birthday party"
i. "jumpers falling"
j. "jumper falling"
k. "jumper"
l. "photo expert"
m. "in pocket"
n. "pocket" "worker"
o. "stricken"
p. "pocket"
q. "window" "building" "construction" "worker"
r. "camera" "pocket" "man" "fall" "jump"
s. "last pictures"
t. "last picture"
u. "last picture" "pocket"
v. "friends at a birthday party"
w. "film is developed"
x. "standing at the window"
y. "chilling chronology"
z. "roll show"
aa. "family is aware"
bb. "recovered from the rubble"
cc. "tower burns"
dd. "laughing" "birthday"

ee. “birthday” “camera”

The FBI meticulously reviewed every hit generated by these searches, manually assessing the results. This review process included both a secondary text search for the terms “disposable,” “camera,” “photo,” or “photograph,” as well as a thorough manual review of each hit to determine its relevance and responsiveness.[10] During this process, the FBI identified a single potentially responsive record documenting the recovery of a disposable camera with images of construction workers. The FBI then reviewed the photographs developed from that camera. Upon reviewing the photographs, the FBI determined that they did not match the descriptions of the images provided by Plaintiff or in the *Baltimore Sun* article and therefore were not responsive to this request. After completing this extensive review, the FBI found no responsive records resulting from these searches.

*Targeted Searches and Results*

23. The FBI determined that due to the nature of the request, the lack of indexable search terms, and information provided by Plaintiff concerning units and divisions that had previously handled the materials, contacting those components directly may be reasonably likely to yield positive results. Therefore, the FBI took the extraordinary step of conducting targeted searches outside of the CRS.

[10] A secondary search refers to terms applied to the subset of hits generated by the FBI’s primary search terms as set forth in ¶ 22 (names listed in a through v and terms listed in a through ee). These secondary terms were used to further narrow potentially relevant records within that subset. A standalone search using these terms alone would likely retrieve a very large number of records, including images from any camera type (disposable, digital, CCTV, or online sources) and any references or discussions of such items across the case file, including images documenting the aftermath, news articles, tip submissions, and other photographic or video materials.

24. Specifically, the FBI, via RIDS, conducted targeted searches of the New York Field Office (NYFO), Counterterrorism Division (CTD),[11] to include the Military Commissions Prosecutions Unit (MCPU), [12] National Security & Cyber Law Branch (NSCLB),[13] and Laboratory Division (LD),[14] to include the LD's Explosive and Evidence Management Units, in response to information provided by Plaintiff and due to the FBI's determination that these offices were the most reasonably likely locations to possess responsive records due to their connections to the PENTBOM investigation and information provided by Plaintiff.

25. On January 6, 2026, the FBI, via RIDS, requested that these offices search for records pertaining to the disposable camera referenced in Plaintiff's request and any photos developed from said camera and its negatives. These offices conducted searches of their internal systems and holdings as described below and were unable to locate records responsive to Plaintiff's request.

---

[11] The FBI's CTD leads law enforcement and domestic intelligence efforts to defeat terrorism.

[12] The FBI's MCPU works in conjunction with DOJ and the Office of the Chief Prosecutor to support the successful prosecution of the Naval Station Guantanamo Bay detainees, whether in Article III or military courts, and to obtain intelligence related to terrorist activities directed against U.S. interests in order to disrupt future attacks.

[13] The FBI's NSCLB of the FBI's Office of the General Counsel (OGC) is the office within the OGC that provides legal support and advice on counterintelligence investigations.

[14] The FBI's LD provides expertise and resources to FBI Field Offices and Law Enforcement partners in the collection, analysis, and documentation of forensic evidence.

| Unit | How Search Was Conducted | Search Term | Notes / Why No Search Needed | Results |
|---|---|---|---|---|
| NYFO, CTD, & MCPU | NYFO, CTD, and MCPU coordinated and worked together in conducting the search efforts. The units engaged in discussions regarding the most effective methods to identify potentially responsive records. The units then queried 1B evidence files in the PENTBOM case file to include the 1B[15] subfile. The units then manually reviewed those results. | "disposable camera" | Through their discussions, the units determined that the search term "disposable camera" was the search term most likely to capture records related to camera referenced in *Baltimore Sun* article. | No responsive records or leads were located. |
| NSCLB | The unit was queried regarding whether it maintained potentially responsive holdings. | N/A | Unit does not maintain evidence | N/A |
| LD | The unit was queried regarding whether it maintained potentially responsive holdings. | N/A | The Explosives Unit advised that all PENTBOM evidence remains with the field offices. Based on that understanding, the unit determined it would not maintain responsive records. | N/A |

26. Additionally, on April 1, 2026, the FBI contacted the current NYFO special agent (SA) assigned to the PENTBOM investigation to inquire if he worked directly with the former SA identified in the *Baltimore Sun* article, Donald Sachtleben. He relayed that he had not worked with the former SA, and he was unaware of any individual in the NYFO who would have been active on the 9/11 investigation at the time of the events discussed in the article.[16]

[15] The FBI identifies evidence requiring a chain of custody as "1B" evidence. 1B's could include items such as drugs, firearms, cameras, etc.

[16] In New York, more than 1,000 employees from 55 of the 56 field offices worked to recover victims, evidence, and personal belongings. Additionally, former SA Sachtleben was a member of the Explosives Units which is a part of the FBI's LD.

27. Plaintiff has provided no information for the FBI to reasonably conclude that records responsive to Plaintiff's FOIA request would reside in any other location, and there is no indication from the FBI's search efforts that responsive records would reside in any other FBI location. Thus, the FBI has searched all locations and files reasonably likely to contain responsive records, and there is no basis for the FBI to conclude that a search elsewhere would reasonably be likely to locate responsive records.

*Court's January 21, 2026 Order*

28. The FBI also considered the specific points raised in the Court's January 21, 2026, Order and has addressed them in its searches, as detailed below:

29. Regarding numbered paragraph 1 of the Court's Order pertaining to efforts to gather information from former supervisory SA Donald Sachtleben. The FBI determined that efforts to contact and obtain information from former SA Sachtleben approximately twenty years after the article's publication, in light of his departure from the unit, and following subsequent changes in evidence locker inventory would not likely result in locating the materials requested.[17] Former SA Sachtleben was incarcerated for many years following his tenure at the FBI, and it is unreasonable to expect that he would have knowledge regarding the location of evidence that was moved after his departure. The evidence bays in which former SA Sachtleben worked are no longer in use, and all items stored there have since been relocated to different areas within the Bureau's custody. Because the movement of these items occurred after former SA Sachtleben left the Bureau and while he was incarcerated, he would not have had any

[17] Additionally, the FBI determined that contacting former SA Sachtleben would not be likely to assist in locating the requested records due to his incarceration in the interim. *See* https://www.justice.gov/usao-sdin/pr/former-federal-contractor-sentenced-disclosing-national-defense-information-and

opportunity or reason to know where these records or physical evidence were subsequently stored. Accordingly, relying on former SA Sachtleben to provide information about the location of evidence is not feasible and would not be a reasonable means of identifying responsive records. However, in an attempt to locate the requested records, as discussed above, RIDS instead conducted a targeted search of the Explosive Unit in which he had previously worked. Additionally, as discussed above, the FBI contacted the NYFO in an attempt to locate any FBI employees who may have worked with former SA Sachtleben at the time, and was not able to identify any employees how had worked with former SA Sachtleben.

a. For context, thousands of FBI employees worked on recovering evidence in New York after September 11, 2001. The FBI does not maintain a list of which employees specifically handled evidence recovery, and many of the personnel involved are no longer employed by the FBI. Even if it were possible to estimate the number of current NYFO employees who worked on 9/11, searching for or interviewing all such individuals would impose an extraordinary burden on the FBI and divert resources from its core mission of investigating crimes. FOIA does not require the FBI to undertake this type of investigative research. The scope of the FBI's response to 9/11 demonstrates the breadth of the effort and the impracticality of searching for individual recollections regarding any single camera or photographic item. Public records indicate that more than 4,000 special agents and 3,000 professional staff assisted in evidence recovery and investigation. In New York alone, more than 1,000 employees from 55 field offices participated in recovering victims, evidence, and personal belongings. Across all sites, the FBI responded to over 500,000 investigative leads, conducted

more than 167,000 interviews, collected and processed over 150,000 pieces of evidence, and took more than 170,000 photographs. Laboratory personnel, document examiners, fingerprint specialists, explosives experts, pilots, and technical specialists from multiple field offices contributed to these efforts. Given this scale, attempting to locate and interview all employees who may have had any exposure to evidence would be infeasible and not required under FOIA.[18]

30. Regarding paragraph 2 of the Court's Order, as detailed above, the search included both searching for a disposable camera as well as any photos developed from said camera and its negatives.

31. Regarding paragraph 3 of the Court's Order pertaining to Evidence Bay 1284 at the FBI's headquarters in Quantico, Virginia, as discussed above, the FBI included the LD's Evidence Management Unit (EMU), which oversees this location, in its targeted search. The location that once housed Evidence Bay 1284 is no longer used for storing evidence, it is now used as a mail room. EMU advised that all items of evidence at the Laboratory are given a unique identifier. EMU regularly conducts evidence audits as an internal measure to ensure the accuracy and integrity of its holdings; these audits serve as a check on EMU's inventory process, but they are not formal records required to be maintained under FBI policy. EMU conducted the most recent audit, in August 2025, and during that review, the camera requested in this litigation was not observed as being in EMU's holdings.

32. Regarding paragraph 4 of the Court's Order pertaining to Evidence Logs, documents queried utilizing the search function within Sentinel discussed above included

[18] See FBI, *Ten Years After: The FBI Since 9/11 – By the Numbers*, available at: https://archives.fbi.gov/archives/about-us/ten-years-after-the-fbi-since-9-11/by-the-numbers (Last accessed May 15, 2026)

evidence logs. In addition, certain offices identified in ¶¶ 23-24, *supra*, conducted reviews of evidence logs associated with their offices as part of their searches of 1B evidence files.

33. Regarding paragraph 5 of the Court's Order pertaining to identifying the 9/11 victim from whom the disposable camera was recovered, as discussed above, the FBI searched for the names of the individuals identified by Plaintiff as the potential 9/11 victim.

**CONCLUSION**

34. The FBI performed adequate and reasonable searches for records and was unable to locate any responsive records subject to the FOIA.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct, and that Exhibits A through E attached hereto are true and correct copies.

Isabel Marie Lara — Digitally signed by Isabel Marie Lara Date: 2026.05.15 11:31:16 -04'00'

Isabel Marie Lara
Acting Section Chief
Record/Information Dissemination Section
Information Management Division
Federal Bureau of Investigation
Winchester, Virginia