**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

JONATHAN WALCZAK,

Plaintiff,

v.

U.S. DEPARTMENT OF JUSTICE and FEDERAL BUREAU OF INVESTIGATION,

Defendants.

Case No. 25-cv-7741 (PAE)

**PLAINTIFF'S MEMORANDUM OF LAW**
**IN SUPPORT OF HIS CROSS-MOTION FOR SUMMARY JUDGMENT**
**AND IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

I. INTRODUCTION ....................1

II. BACKGROUND ....................2

III. LEGAL STANDARD ....................4

IV. ARGUMENT ....................5

A. Defendants wrongly limited their search of New York Field Office records to those containing the exact phrase "disposable camera" ....................5

B. Defendants did not use reasonable search terms when searching investigatory records ....................8

C. Defendants should have contacted Special Agent Sachtleben ....................9

D. Defendants should have contacted other FBI officials ....................12

E. Defendants should have searched contemporaneous evidentiary audits ....................13

V. CONCLUSION ....................13

# TABLE OF AUTHORITIES

***Page***

***Cases***

*Am. Oversight v. U.S. Dep't of Health & Hum. Servs.*, 101 F.4th 909 (D.C. Cir. 2024) ................7

*Blanton v. U.S. Dep't of Just.*, 182 F. Supp. 2d 81 (D.D.C. 2002) ...............................................11

*Borowski v. CBP*, 733 F. Supp. 3d 171 (W.D.N.Y. 2024)............................................................7

*Brennan Cent. for Justice at N.Y. Univ. Sch. of Law v. ICE*, 571 F. Supp. 3d 237 (S.D.N.Y. 2021) ..........................................................................................................4, 7

*Campbell v. U.S. Dep't of Just.*, 164 F.3d 20 (D.C. Cir. 1998) ....................................................11

*Carney v. DOJ*, 19 F.3d 807 (2d Cir. 1994) ....................................................................................4

*Cox v. DOJ*, 111 F. 4th 198 (2d Cir. 2024)......................................................................................4

*Gelb v. Fed. Rsrv. Bank of New York*, No. 112CV04880ALCAJP, 2015 WL 14072543 (S.D.N.Y. Sept. 17, 2015)........................................................................................................11

*Gov't Accountability Project v. U.S. Dep't of Homeland Sec.*, 335 F. Supp. 3d 7 (D.D.C. 2018) .......................................................................................................................6

*Immigrant Def. Project v. United States Immigr.*, 208 F. Supp. 3d 520 (S.D.N.Y. 2016) .............6

*Knight First Amend. Inst. at Columbia Univ. v. Centers for Disease Control & Prevention*, 560 F. Supp. 3d 810 (S.D.N.Y. 2021)................................................................................6

*Kowalczyk v. U.S. Dep't of Justice*, 73 F.3d 386 (D.C. Cir. 1996)................................................11

*Larson v. Dep't of State*, 565 F.3d 857 (D.C. Cir. 2009)...............................................................10

*Morley v. Central Intel. Agency*, 508 F.3d 1108 (D.C. Cir. 2007) .................................................4

*NAACP Legal Def. & Educ. Fund, Inc. v. DOJ*, 463 F. Supp. 3d 474 (S.D.N.Y. 2020).............5, 7

*Nat'l Day Laborer Org. Network v. U.S. Immigr. & Customs Enf't Agency*, 877 F. Supp. 2d 87 (S.D.N.Y. 2012)................................................................................4

*New York Legal Assistance Grp. v. Bd. of Immigr. Appeals*, 987 F.3d 207 (2d Cir. 2021) ............9

*Ruotolo v. Dep't of Just., Tax Div.*, 53 F.3d 4 (2d Cir. 1995).........................................................8

*Seife v. U.S. Dep't of State*, 298 F. Supp. 3d 592 (S.D.N.Y. 2018)..........................................9, 10

*Shteynlyuger v. Centers for Medicare & Medicaid Servs*., 698 F. Supp. 3d 82 (D.D.C. 2023)......7

***Statutes***

5 U.S.C. § 552(a)(6)(A)(ii) ..........................................................................................................3

***Other Authorities***

Fed. R. Civ. P. 56(a) ...................................................................................................................4

## I. INTRODUCTION

Plaintiff Jonathan Walczak made a FOIA request for photographs taken during the 9/11 terrorist attacks by a victim who tragically fell from one of the towers. These images represent a unique record in our country's history—there is no other known media captured in the towers above a point of impact. Defendants previously showed the photographs to a *Baltimore Sun* reporter, and their contents were described in a December 2003 newspaper article. There is no reason to believe Defendants no longer possess them.

In response to the FOIA request, Defendants initially refused to search their records for the photographs. After a status conference with the Court, Defendants elected to search for the first time. That search, which did not locate the photographs, had serious deficiencies.

For example, with respect to their search of the New York Field Office—which Defendants represent is where much of the evidence recovered from the incident is stored—Defendants limited their search to records that contain the exact phrase, "disposable camera." That is not a reasonable search strategy. The significance of these images is what they show, not that they were taken by a disposable (rather than reusable) camera. Defendants' search would miss, for example, records described as "camera recovered from victim", or references to "pictures," "pics," or "images." Defendants' search of investigatory files and evidentiary audits was similarly deficient.

Further, although the Court requested information concerning Defendants' efforts to "[g]ather information from former supervisory special agent Donald Sachtleben that could help it locate the requested materials," Order at 1, ECF No. 20, Defendants have elected to not even contact him. Their basis for not doing so is that the FBI's recordkeeping systems have changed since he worked there. That, however, misses the point. Sachtleben may have details that could aid in the search, such as information about the camera, the images, the victim, how the records would have been coded or described internally at the time, which FBI agents were involved, etc.

Not contacting the one person known to have personal involvement with the camera was unreasonable. And at the very least, Defendant should have taken additional reasonable steps to ascertain who within the agency might have relevant information, like identifying such employees or sending a simple email to the New York Field Office. The Court should therefore grant summary judgment to Walczak and order Defendants to address the deficiencies in their search.

## II. BACKGROUND

Plaintiff Jonathan Walczak is an investigative journalist, podcaster, and documentary filmmaker. Walczak Decl.¶ 3. He is producing a documentary about photographic evidence recovered from the World Trade Center site following the September 11 attacks. *Id.* ¶ 4.

Walczak learned from a 2003 *Baltimore Sun* article that the FBI possessed never-before-seen photos taken from inside the World Trade Center during the attacks. Walczak Decl. ¶ 6. The article describes their contents as follows:

> The photos show the man, who appears to be a construction worker, standing at the window as the other tower burns behind him. The photos, which include pictures he took as well as a few taken by someone else, also capture other jumpers falling. The man looks stricken, his face one of shock and disbelief.

Lara Decl. Ex. C at 10, ECF No. 28-3. It also says the photos were taken with a "disposable camera." *Id.*

For years, Walczak has researched the photos, including who might have taken them, what they depict, and where they might be today. Walczak Decl. ¶ 7. Because the photos depict a unique view of history, and because it is unclear whether or not the FBI made the photos available to the National Commission on Terrorist Attacks Upon the United States, also known as the 9/11 Commission, Walczak undertook multiple steps to locate them. *Id.* ¶ 8.

One step included reaching out to former FBI Special Agent Donald Sachtleben, who had been interviewed for the *Baltimore Sun* article while employed by the FBI. *Id.* ¶ 9. Walczak made

contact with Sachtleben, but the latter declined to provide any information because the FBI had not authorized it, thus suggesting that he had some information that could lead to their discovery. *See* Walczak Decl. ¶ 10; Walczak Decl. Ex. 1.

Walczak also attempted to identify the photographer, which also could have provided additional leads. *See* Walczak Decl. ¶ 11. Years ago, he contacted the *Baltimore Sun* reporter, but the reporter had no records or recollection of the photographer's identity. *See id.* ¶ 12. Walczak also attempted to triangulate information in the article with public data in order to identify the photographer. *Id.* ¶ 13. Because the article describes the photos as showing a man who appears to be a construction worker, who could be the photographer, Walczak undertook extensive research to identify all construction and construction-adjacent workers from a public list of 9/11 victims and winnow that list down, based on additional public information, to a set of 22 individuals whom he estimated could plausibly be the photographer. *Id.* ¶ 14. However, he was unable to reduce the list further, and because the public record does not contain extensive information about all the victims, the photographer might not be on Walczak's list. *Id.* ¶ 15.

Having exhausted other options, Walczak made a FOIA request for "photos developed by the FBI from a disposable camera recovered by the FBI from the rubble of the World Trade Center after the September 11, 2001, terrorist attacks." Lara Decl. Ex. A at 4, ECF No. 28-1. On July 14, 2025, the FBI denied the request in full, claiming that the request was "not searchable" and the FBI Central Records System "is not arranged in a manner that allows for the retrieval of information in the form [Walczak] requested." Lara Decl. Ex. B, ECF No. 28-2.

The next day, Walczak administratively appealed the FBI's denial and attached the *Baltimore Sun* article. Lara Decl. Ex. C. Under FOIA, agencies are required to "make a determination with respect to any appeal within twenty [business] days." 5 U.S.C. §

552(a)(6)(A)(ii). Defendants did not meet that deadline. Walczak Decl. ¶ 17. Three months later, still not having received a response, Walczak brought this suit. *Id.*; *see generally* Compl., ECF No. 1-1.

On January 21, 2026, this Court held a status conference with the parties in which it "stated its expectation that the Government's administrative record" would address "the Government's efforts, and any results of such efforts" to locate the missing photographs through, among other things, gathering information from former Special Agent Sachtleben. Order at 1, ECF No. 20.

After the conference, Defendants searched for the first time for responsive records but did not find the photos or the camera. Indeed, they did not even find a record of them. The parties conferred following those searches. The conferrals ended after Defendants decided to file their motion while, from Walczak's perspective, several issues remained open. At summary judgment, the parties now dispute the adequacy of Defendants' search.

## III. LEGAL STANDARD

In FOIA cases, like all others, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Cox v. DOJ*, 111 F. 4th 198, 207 (2d Cir. 2024).

Where, as here, the parties dispute the adequacy of the search performed, the "agency bears the burden of demonstrating that it conducted an adequate search for records responsive to the FOIA request." *Brennan Cent. for Justice at N.Y. Univ. Sch. of Law v. ICE*, 571 F. Supp. 3d 237, 244 (S.D.N.Y. 2021) (citing *Carney v. DOJ*, 19 F.3d 807, 812 (2d Cir. 1994)). To meet that burden, the agency must "show beyond material doubt that it has conducted a search reasonably calculated to uncover all relevant documents." *Nat'l Day Laborer Org. Network v. U.S. Immigr. & Customs Enf't Agency*, 877 F. Supp. 2d 87, 95 (S.D.N.Y. 2012) (quoting *Morley v. Central Intel. Agency*, 508 F.3d 1108, 1114 (D.C. Cir. 2007)).

## IV. ARGUMENT

The sole issue at summary judgment is whether Defendants performed an adequate search for the missing photos. Courts commonly find FOIA searches inadequate "where the agency's response raises serious doubts as to the completeness of the agency's search, where the agency's response is patently incomplete, or where the agency's response is for some other reason unsatisfactory." *NAACP Legal Def. & Educ. Fund, Inc. v. DOJ*, 463 F. Supp. 3d 474, 483 (S.D.N.Y. 2020). Here, numerous serious deficiencies in Defendants' search render it inadequate.

### A. Defendants wrongly limited their search of New York Field Office records to those containing the exact phrase "disposable camera."

Defendants represent that "all PENTBOM [the 9/11 investigative case file] evidence remains with the field offices." Lara Decl. ¶ 25. When they searched that evidence in the New York Field Office, they only looked for records that contain the exact phrase "disposable camera." *Id.* Unsurprisingly, they did not find anything. That was not a reasonable search.

Defendants' basis for their approach was that the article in the *Baltimore Sun* had used the term "disposable camera." They contend that this phrase was therefore "the search term most likely to capture records related to [the] camera referenced in [the] *Baltimore Sun* article." *Id.*

As a preliminary matter, this assertion is incorrect—the search term "camera" would be more "likely to capture records" than the search term "disposable camera" because it would capture all records that contain the term "disposable camera" but also others as well.

In any event, "disposable camera" is not reasonable as a sole search term. To see why, it is useful to step back and consider how FBI officials interacting with the records likely would have described them. Examples that come to mind are things like "images from camera found on victim," "camera recovered from body," "photos taken by a victim," and the like. There is no reason to think that whether the camera was disposable (as opposed to reusable or digital) would

have been especially important to note, or that the specific phrase "disposable camera" would have been used. The reason these photographs matter—and would have mattered to investigators at the time—is because of what the images depict, not the type of camera that took them. And it is of no moment that Walczak's request and the *Baltimore Sun* article happened to use that phrase, for the relevant question is how it would be described in the FBI's internal systems. *See Gov't Accountability Project v. U.S. Dep't of Homeland Sec.*, 335 F. Supp. 3d 7, 12 (D.D.C. 2018) ("FOIA requests are not a game of Battleship. The requester should not have to score a direct hit on the records sought based on the precise phrasing of his request.").

Defendants appear to agree. For example, in their search of the FBI's Central Records System ("CRS"), Defendants incorporated broader terms such as "camera," "photo," etc. Lara Decl. ¶ 22. But for their search of the PENTBOM evidence in the New York Field Office, they limited their search to solely the phrase "disposable camera." *Id.* ¶ 25.

Yet Defendants do not concretely explain why they chose this single search term for the New York Field Office search despite using broader terms for their CRS search. That distinguishes their lead case standing for the notion that agencies have discretion to craft search terms. *See Immigrant Def. Project v. United States Immigr.*, 208 F. Supp. 3d 520, 528 (S.D.N.Y. 2016) ("Defendants, in fact, provide explanations for why some search terms, in particular, were not used."). The closest they come to a justification—that "the units determined that the search term 'disposable camera' was the search term most likely to capture records related to the camera referenced in the *Baltimore Sun* article," Lara Decl. ¶ 25—rests on a misapprehension of the law. The agency's duty is not to use the single search term "most likely" to capture records, but ***all*** search terms reasonably likely to do so. *See Knight First Amend. Inst. at Columbia Univ. v. Centers for Disease Control & Prevention*, 560 F. Supp. 3d 810, 824 (S.D.N.Y. 2021) (rejecting

argument that an agency may avoid search terms likely to return large numbers of nonresponsive documents because "an agency's duty under FOIA is not to strike such a balance; it is to conduct a search reasonably calculated to uncover all relevant documents, unless such a search would be an undue burden"); *Shteynlyuger v. Centers for Medicare & Medicaid Servs.*, 698 F. Supp. 3d 82, 114 (D.D.C. 2023) ("[T]he question is not whether the agency searched the ***most*** likely places to maintain responsive records; the question is whether the agency searched ***all*** places where records were reasonably likely to be found.") (emphases in original). And as explained above, it is simply not true that the term "disposable camera" was likely to locate the camera given how officials plausibly would have described it at the time and the fact that its being disposable likely would not have been salient to investigators. No amount of discretion can change that fact. *See Am. Oversight v. U.S. Dep't of Health & Hum. Servs.*, 101 F.4th 909, 923 (D.C. Cir. 2024) (holding that agencies' discretion in crafting search terms "does not permit an agency to omit from their search obvious alternative terms without a detailed justification").

In short, Defendants have failed to establish that this single search term was sufficient to locate the evidence in question. *See, e.g.*, *Borowski v. CBP*, 733 F. Supp. 3d 171, 182 (W.D.N.Y. 2024) (finding that agency had not "met its burden in establishing the reasonableness of its search for responsive records" because it failed to show "why these search terms were comprehensive enough to locate responsive records"); *Brennan Cent. for Justice*, 571 F. Supp. 3d at 246 (finding that "obvious gaps in the search terms" were "grounds to find the search inadequate"); *NAACP*, 463 F. Supp. 3d at 486–87 (finding that agency's selected search terms were "unreasonably narrow").

Accordingly, the Court should require that the New York Field Office search be performed with the same terms as the CRS search, including any additional terms resulting from this motion. *See* Section IV.B, *infra*.

**B. Defendants did not use reasonable search terms when searching investigatory records.**

In their search of the "PENTBOM" investigatory case file, Defendants limited their search to records that had either (a) the full name of one of 22 individuals provided by Walczak who might have been the photographer; or (b) phrases taken from the *Baltimore Sun* article such as "disposable," "FBI team puts together," "friends at a birthday party," "chilling chronology," etc. Lara Decl. ¶ 22. These are narrow searches, and it is therefore unsurprising that the FBI only located one potentially responsive record, which it later determined to be non-responsive. *See id.*

Defendants do not explain why broader search terms could not have been used. They do not, for instance, disclose how many records in the PENTBOM case file contain more general terms like "camera", "film", "photos", "photo", "images", "image", "photograph", "photographs", "picture", "pictures", "footage", and "negatives."[1] Further, even if the search needs to be further narrowed, there are ways to do it that would be more likely to locate the records at issue than using terms taken from the *Baltimore Sun* article, such as "camera" used in connection with terms like "recovered," "on body," "from victim," etc.

Defendants allude to the possibility that a broader search would not be "feasible," suggesting that it would impose an undue burden on the agency. Def. Br. at 12, ECF No. 27. But that is just speculation. To the extent agencies may decline to perform searches for undue burden, courts have required some quantification of the burden involved. *See, e.g.*, *Ruotolo v. Dep't of*

[1] Defendants used some of these broader phrases only as "secondary search terms" in order to narrow the results of the primary terms. Lara Decl. ¶ 22 & n.10. Their use for this limited purpose thus cannot cure the undue narrowness of the primary terms.

*Just., Tax Div.*, 53 F.3d 4, 9 (2d Cir. 1995) (citing cases that found undue burden after such quantification); *New York Legal Assistance Grp. v. Bd. of Immigr. Appeals*, 987 F.3d 207, 225 (2d Cir. 2021) (finding request unduly burdensome after agency showed that it implicated over 750,000 Board of Immigration Appeals opinions and introduced evidence that it "would take four employees working full-time nearly seven years to prepare these opinions for publication"); *NAACP*, 463 F. Supp. 3d at 487 (rejecting a "speculative and cursory explanation" of burden because it "fails to describe with reasonable specificity the actual burden imposed by the request"); *Seife v. U.S. Dep't of State*, 298 F. Supp. 3d 592, 612 (S.D.N.Y. 2018) (rejecting agency's "undue burden" argument because agency "provides no information regarding the total number of email accounts that would need to be searched, or the level of difficulty of, or amount of time required by, the search process itself"). Defendants have not quantified any burden here. But if the search terms proposed above turn out to be infeasible, Walczak is willing to work with Defendants to narrow them while preserving a reasonable chance to find the photos.

Thus, for the search of the PENTBOM case file as well, the Court should require that searches be performed with broader terms noted above, and order the parties to confer about possible narrowing should Defendants believe, after preliminary searches, that the broader terms would impose an undue burden.

### C. Defendants should have contacted Special Agent Sachtleben.

In its January 21, 2026, order, the Court stated that Defendant should address "the Government's efforts, and any results of such efforts, to [g]ather information from former supervisory special agent Donald Sachtleben that could help it locate the requested materials." Dkt. 20 at 1. In response, Defendants state that they made no such efforts. Their justification for not doing anything was that their recordkeeping system has changed since Sachtleben left the FBI. Lara Decl. ¶ 29. That misses the point. The value of contacting Sachtleben is that he could provide

additional information about the records that may aid in the search for them, not that he would be expected to know precisely where the records at issue are currently stored.

Sachtleben, for example, may have details that could help craft specific search terms, such as information about the camera, the images, the victim, how the records would have been coded or described internally, which FBI officials were involved, etc. Having such information would be markedly better than Defendants' FOIA officer having to make up search terms based on a newspaper article. Further, Defendants state that they do not know "any FBI employees who may have worked with former SA Sachtleben at the time." Lara Decl. ¶ 29. A straightforward way of remedying that, of course, would be to simply ask him whom he worked with. Further, while he might not know where the records are currently stored, he could well know where the camera was moved from Evidence Bay 1284, its location at the time of the *Baltimore Sun* article, which could well generate additional leads. Yet Defendants did not even contact him.

Notably, Plaintiff himself has contacted Sachtleben in an attempt to get more information. In October 2020, Sachtleben sent a letter in response, explaining that he "gave the interview to the *Baltimore Sun* with the full knowledge and authorization of the FBI" but now "no longer hold[s] that authority." Walczak Decl. Ex. 1. As a result, he "do[es] not feel comfortable discussing" the issue with a member of the public. *Id.* This suggests that, far from being an exercise in futility, Sachtleben does in fact have information he could share with the FBI were they to ask.[2]

Contrary to Defendants' suggestion, *see* Def. Br. at 14, there is no *per se* rule that agencies need not contact former employees. The rule for all searches is the same: the agency must take reasonable efforts "in light of the specific request." *Seife*, 298 F. Supp. 3d at 609 (quoting *Larson v. Dep't of State*, 565 F.3d 857, 869 (D.C. Cir. 2009)). In the two cases cited by Defendants,

[2] In the alternative, Walczak could serve a subpoena on Sachtelben.

contacting former employees would have been unreasonable in the circumstances, and there was no indication, unlike here, that they possessed any unique information. *See Blanton v. U.S. Dep't of Just.*, 182 F. Supp. 2d 81, 86 (D.D.C. 2002) (declining to require the agency to contact former employees "[g]iven the age of the investigation in this case and the prospect that some of these retired agents may be difficult to contact or deceased"); *Gelb v. Fed. Rsrv. Bank of New York*, No. 112CV04880ALCAJP, 2015 WL 14072543, at *8 (S.D.N.Y. Sept. 17, 2015) (holding that contacting former employees would have been a "pointless endeavor" based on the specific facts of that case). Indeed, *Blanton* recognizes that contacting former employees can sometimes be required. *See Blanton*, 182 F. Supp. 2d at 86 (holding that contacting former employees is not necessary "in most instances").

Defendants, meanwhile, mischaracterize their remaining case, which they construe as holding categorically that an agency "is not obliged to look beyond the four corners of the request for leads to the location of responsive documents." *Kowalczyk v. U.S. Dep't of Justice*, 73 F.3d 386, 389 (D.C. Cir. 1996). The D.C. Circuit made that statement while rejecting the argument that an agency needed to search for records beyond a particular location specifically named in the request. *See id*. It did not hold that agencies need not follow reasonable leads. Indeed, the same court clarified just two years later that a reasonable search requires the agency to "account for leads that emerge during its inquiry." *Campbell v. U.S. Dep't of Just.*, 164 F.3d 20, 28 (D.C. Cir. 1998). In appropriate circumstances like this one, that can involve contacting a former employee. And in any event, Walczak's administrative appeal, submitted before the FBI conducted its search, attached the *Baltimore Sun* article that specifically referenced Special Agent Sachtleben as someone with relevant information.

In short, because Sachtleben could reasonably provide critical information that allows the

government to zero-in on the missing images, the Court should order that he be contacted.

**D. Defendants should have contacted other FBI officials.**

In addition to not contacting Sachtleben, Defendants also did not reach out to any other FBI officials, including those with personal involvement. Defendants attempt to justify this by emphasizing the scale of the 9/11 response generally, noting that "[a]cross all sites, the FBI responded to over 500,000 investigative leads, conducted more than 167,000 interviews, collected and processed over 150,000 pieces of evidence, and took more than 170,000 photographs." Lara Decl. ¶ 29. "[I]nterviewing all such individuals" involved in that process, *id.*, might be unwarranted. But it does not follow from this that contacting nobody is the solution.

First, rather than "interviewing" all potentially involved individuals, Defendants simply could have emailed staff at the relevant locations, such as the New York Field Office and the Explosives Unit, to inquire if anyone had any knowledge of the camera or its whereabouts. If nobody responded after a reasonable amount of time, that would end the inquiry. This step could reasonably could have borne fruit and would have imposed virtually no burden.

Second, Sachtleben worked specifically in the Explosives Unit of the FBI's Laboratory Division. Defendants do not indicate how many officials are presently in that specific unit. Since that unit possessed the camera, it would have been reasonable to inquire as to whether any employees remaining in that unit plausibly could have encountered it. While the FBI did approach the Explosives Unit, it did not ask that question: it asked only "whether it maintained potentially responsive holdings." Lara Decl. ¶ 25. The FBI at least should have ascertained who (if anyone) within the Explosives Unit could have had information about the camera, and focused on those individuals. Second, the 9/11 attack was a quarter of a century ago, and thus the universe of potential officials is limited by those with enough tenure to have actually participated. In other

words, there are plainly ways to determine the current FBI agents most likely to have relevant information. The Court should order that at least some attempt be made to contact such employees.

### E. Defendants should have searched contemporaneous evidentiary audits.

The *Baltimore Sun* article describes the storage of evidence related to 9/11 in "a chilly, cavernous garage known as Evidence Bay 1284." Lara Decl. Ex. C at 7. In their declaration, Defendants state that this location was overseen by the "Evidence Management Unit (EMU)" that "regularly conducts evidence audits." Lara Decl. ¶ 31. To ascertain whether the evidence at issue might have been stored there, Defendants state that "the most recent audit, in August 2025" did not list it "as being in EMU's holdings." *Id.* The fundamental problem with this approach is that if the camera or film was transferred out prior to August 2025, it presumably would not have shown up on this log. Given that EMU "regularly conducts evidence audits," *id.*, it stands to reason that evidence audits from a more contemporaneous time period would exist, and Defendants do not explain why none of those earlier evidence audits were searched.

## V. CONCLUSION

For the foregoing reasons, the Court should grant summary judgment to Plaintiff, deny summary judgment to Defendants, and order Defendants to address the deficiencies in their search.

Dated: June 5, 2026

Respectfully submitted,

<u>*/s/ Stephen Stich Match*</u>

Stephen Stich Match (5567854)
LOEVY & LOEVY
222 Sutter Street, Suite 600A
San Francisco, CA 94108
(312) 243-5900
match@loevy.com
foia@loevy.com

Merrick Jason Wayne (*pro hac vice*)
LOEVY & LOEVY
311 North Aberdeen, 3rd Floor

Chicago, IL 60607
(312) 243-5900
foia@loevy.com

*Attorneys for Plaintiff*