UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JONATHAN WALCZAK,

Plaintiff,

v.

DEPARTMENT OF JUSTICE, and FEDERAL BUREAU OF INVESTIGATION,

Defendants.

25 Civ. 7741 (PAE)

**DEFENDANTS' REPLY BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**

JAY CLAYTON
United States Attorney for the
Southern District of New York
*Attorney for Defendants*
86 Chambers Street, 3rd Floor
New York, New York 10007

Dominika Tarczynska
Assistant United States Attorney
*Of Counsel*

## TABLE OF CONTENTS

**Page(s)**

PRELIMINARY STATEMENT .......... 1

ARGUMENT .......... 3

A. The FBI's Search of NYFO Files Was Adequate .......... 3

B. The FBI Used Reasonable Search Terms .......... 3

C. The FBI Was Not Required to Contact Former SA Sachtleben .......... 5

D. The FBI Contacted Subject Matter Experts .......... 7

E. The FBI's Search Included Available Evidence Logs and Audits .......... 8

CONCLUSION .......... 9

Defendants the Federal Bureau of Investigation ("FBI") and the Department of Justice ("DOJ") (together, the "Government") respectfully submit this memorandum of law in further support of their motion for summary judgment, ECF No. 26, and in opposition to Plaintiff's cross motion for summary judgment, ECF No. 29.

**PRELIMINARY STATEMENT**

As explained in the Government's opening brief, ECF No. 27 ("Gov. Br."), the FBI has gone above and beyond its obligations under the Freedom of Information Act to search for the disposable camera, photographs, and associated negatives related to Plaintiff Jonathan Walczak's FOIA request. The FBI conducted an exhaustive search for records that, if they ever existed, are nearly twenty-five years old, were mentioned in a single newspaper article more than twenty-two years ago, and have no obvious mechanism for location within the FBI's voluminous file for its investigation of the September 11 attacks. The FBI has exceeded FOIA's standard, which requires only a reasonable search. None of the arguments raised by Plaintiff in his brief, ECF No 30 ("Pl. Br."), undermine the reasonableness of the FBI's search.

*First,* Plaintiff is incorrect in arguing that the search of the FBI's New York Field Office ("NYFO") files was limited to the single search term "disposable camera." The NYFO's files related to the 9/11 investigation are contained in the PENTBOM file, which was searched using fifty-two search terms crafted by FBI based on information provided by Plaintiff. Thus, Plaintiff's request that the Court order the NYFO to use additional search terms is moot: the NYFO files were already included in the search of the larger PENTBOM file.

*Second,* Plaintiff's argument that the FBI's search terms were not reasonable is equally meritless. Contrary to Plaintiff's assertion, FBI's search for the names of possible victims was not limited to using "full names." Rather, the FBI's search included possible middle name variations, as well as a manual review of indexed names that included missing first or last names. As shown

in a supplemental declaration filed with this brief, the broad additional search terms that Plaintiff seeks are not reasonably targeted to identify responsive records and would result in the return of over 119,000 potentially responsive records that would need to be manually reviewed. FOIA does not require the FBI to search for the proverbial needle in a haystack.

*Third,* the FBI was not required to contact former Special Agent Sachtleben, who has not been employed at the FBI for more than 14 years, and spent more than 11 of those years incarcerated. Plaintiff does not dispute that former SA Sachtleben would not have any information about the *current* whereabouts of the requested camera and negatives, given changes in evidence storage in the decade-plus since he left the FBI. Instead, Plaintiff argues that the FBI should interview the former special agent in the hope that he might have some additional information that would help formulate additional search strategies. But FOIA does not require the FBI to become a full-time investigator on behalf of Plaintiff in his quest to locate the photographs. Likewise, Plaintiff is wrong that the FBI did not contact current FBI personnel—to the contrary, during its search the FBI reached out to the units that it deemed most likely to have information about the possible location of the requested camera and its contents and contacted FBI personnel who were familiar with the 9/11 investigation, evidence recovery efforts, and the processing and inventory of evidence.

*Finally*, the FBI's search included available evidence logs and audits. Contrary to Plaintiff's speculation, the EMU (the unit that currently oversees former Evidence Bay 1284, a location mentioned in the *Baltimore Sun* article provided by Plaintiff) does not maintain evidence audits that are contemporaneous with the 2003 article.

## ARGUMENT

### A. The FBI's Search of NYFO Files Was Adequate

Plaintiff's primary argument—that the FBI purportedly limited its search of NYFO files to the single search term "disposable camera"—is factually mistaken. *See* Pl. Br. 1, 5-8. The FBI searched the NYFO files with the same search terms it employed in its search of the FBI's Central Record System ("CRS") because the NYFO's files related to the 9/11 investigation are contained in the PENTBOM file in CRS. *See* Declaration of Christina L. Driver ("Driver Decl.") ¶ 6. And the entire PENTBOM file—including files from the NYFO—was searched using search terms based on the names of twenty-one individuals identified by Plaintiff and thirty-one additional search terms crafted by the FBI based on based on information contained in the original request and in the *Baltimore Sun* article later provided by Plaintiff. *See id.* ¶ 8; ECF No. 28 ("Lara Decl.") ¶¶ 6-8. In addition, in an attempt to pursue every reasonable lead, the FBI also contacted the NYFO (along with other relevant offices) to ensure that the offices most directly involved in the collection, maintenance, and review of 9/11 evidence were consulted on the matter. *See* Driver Decl. ¶ 7. The NYFO then conducted its own search in the location it deemed most likely to contain the specific type of evidence at issue—the 1B subfile of the PENTBOM file, which is where evidence requiring a chain of custody (including a camera) is stored—using the term deemed most likely to locate the result in responsive records: "disposable camera." *Id.*; *see also* Lara Decl. ¶ 25.

Thus, Plaintiff's request to have the NYFO conduct additional searches using the same terms as the CRS search, Pl. Br. 8, would be redundant. This search has already been done.

### B. The FBI Used Reasonable Search Terms

A federal agency, which knows its own operations, records and systems, "has discretion in crafting a list of search terms that they believe to be reasonably tailored to uncover documents

responsive to the FOIA request." *Immigrant Def. Project v. United States Immigr.*, 208 F. Supp. 3d 520, 528 (S.D.N.Y. 2016) (quoting *Bigwood v. United States Dep't of Def.*, 132 F. Supp. 3d 124, 140 (D.D.C. 2015)). The FBI has explained why it used the terms that it did, and why its approach was reasonable. *See* Gov. Br. 5, 11-13; Lara Decl. ¶ 22. Plaintiff's contention that these terms were overly narrow because they included "full names" of 22 individuals and did not include broad terms like "camera," "film," "photos," "photo," "images," "image," "photograph," "photographs," "picture," "pictures," "footage," and "negatives," *see* Pl. Br. 8-9, is without merit.

First, Plaintiff is incorrect that FBI only searched for "full names" of the twenty-two individuals Plaintiff identified as potentially being the 9/11 victim to whom the camera belonged. As explained in the Driver Declaration, FBI's searches of the PENTBOM file included searching for any potential middle names and middle initials of the individuals provided by Plaintiff, which did not locate any responsive records pertaining to the subject of the request. *See* Driver Decl. ¶ 12. In addition, FBI conducted a manual review of all indexed names associated with the PENTBOM case and, while there are names indexed with missing first or last names, none of those names were consistent with the list of names provided by Plaintiff. *Id.*

Second, the additional terms that Plaintiff proposes are not reasonably targeted to locate the camera or its contents, and would impose an unreasonable burden on the FBI. As explained in the Driver Declaration, these terms would not facilitate a reasonable search, particularly when such terms would be used for a text search across the entire PENTBOM file. *Id.* ¶ 9. The FBI expects that using the terms that Plaintiff suggests would identify as potentially responsive a vast array of records unrelated to the camera and its contents. This would include, for example: any file saved as an image; any reference to an image, photo, or picture in interview notes; any documents where

agents showed or shared an image or photograph to any potential witnesses and/or other law enforcement personnel; discussions of disposable and non-disposable cameras of all kinds, including security cameras, traffic cameras, body cameras, etc. *Id.*

To confirm its hypothesis, the FBI tested the terms suggested by Plaintiff and found that they generated 119,608 potentially responsive records. *Id.* ¶ 10. This vast collection of low-quality results would then have to be manually reviewed. *Id.*

FOIA does not require the FBI to undertake such a burdensome review in the hopes of finding a single camera and its contents that may have existed twenty-five years ago. *See Am. Fed. of Gov't Emp. v. Dep't of Commerce,* 907 F.2d 203, 209 (D.C. Cir. 1990) (finding unreasonably burdensome a request for additional responsive records where "if they exist, could be found only through a page-by page search through the 84,000 cubic feet of documents in the [CIA] Records Center"); *Wolf v. C.I.A.*, 569 F. Supp. 2d 1, 8 (D. D.C. 2008) (CIA was not required to undertake search for "a single, specific record with an unknown title" in a poorly-catalogued microfilm archive); *Taggart v. Off. of the Inspector Gen.*, No. 10 Civ. 5447 (PGG), 2011 WL 13128214, at *8 (S.D.N.Y. Sept. 22, 2011) ("[A]gency is not expected to take extraordinary measures to find the requested records."), *aff'd*, 530 Fed. Appx. 17 (2d Cir. 2013).

### C. The FBI Was Not Required to Contact Former SA Sachtleben

Contrary to Plaintiff's contention, *see* Pl. Br. 9-12, the FBI was not required to contact former Special Agent Sachtleben. As the Government explained in its opening brief, former SA Sachtleben retired from the FBI more than 18 years ago, stopped working as an FBI contractor 14 years ago, and then spent more than 11 years incarcerated. *See* Gov. Br. 14-15; Lara Decl. ¶ 29. The FBI concluded that there is no reasonable basis to believe that he would know the current location of the camera or its contents. Plaintiff does not dispute this fact. Instead, Plaintiff argues

that the FBI should interview former SA Sachtleben in the hopes that he might have information that could help craft additional search terms, or identify employees who may have worked with him at the time who could then be asked if they know what happened to the camera, or find out to where the camera was moved from Evidence Bay 1284.[1] But "FOIA was not intended to reduce government agencies to full-time investigators on behalf of requesters." *Amnesty Int'l USA v. CIA*, No. 07 Civ. 5435 (LAP), 2008 WL 2519908, at *12 (S.D.N.Y. June 19, 2008). It does not require the FBI to go to such great lengths collecting clues as to where a single item requested by a FOIA request might be—diverting its resources from its core law enforcement mission.

Plaintiff seeks to distinguish the cases cited in the Government's brief—in which courts declined to require an agency to contact former employees, *see Blanton v. DOJ,* 182 F. Supp. 2d 81, 85 (D.D.C. 2002); *Gelb v. Fed. Rsrv. Bank of N.Y.*, No. 12 Civ. 4880 (ALC) (AJP), 2015 WL 14072543, at *8 (S.D.N.Y. Sept. 17, 2015)—by arguing that those cases do not establish that there is a *per se* rule that agencies need not contact former employees. *See* Pl. Br. 10-11. That is beside the point. Plaintiff has not pointed to a single case in which a court did require an agency to contact

---

[1] Plaintiff has repeatedly argued that Evidence Bay 1284 was the location of the camera at the time of the *Baltimore Sun* article, *see, e.g.,* Pl. Br. 13. However, a close reading of the article makes clear that the article in fact does not say that. The article opens with a description of certain evidence in Evidence Bay 1284—a suitcase (which it is revealed later in the article did not make its connection to Flight 11), "hijacker keys," "hijacker bags," "hijacker computer hard drives", "hijacker toothbrushes." There is no mention of the camera sought by the FOIA request in this description of the evidence observed in Evidence Bay 1284. *See* Lara Decl. Ex. C (ECF No. 28-3) at 7. Towards the end of the article, there is discussion of the camera at issue—noting that is a piece of evidence that "few outside the [Explosives] [U]nit know of"—but there is no specific discussion of its location. *Id.* at 10. Nevertheless, the FBI undertook an extensive search to determine whether the evidence was still in the possession of the FBI unit that now oversees that location (which is now a mail room). *See* Lara Decl. ¶ 31; Driver Decl. ¶¶ 15-16. This search did not locate the camera or the images.

a former employee, particularly a long-retired one, in the hopes of using information that he might have to design further steps in a search for documents. The FOIA does not require federal agencies to perform such research in the hopes of discovering leads to responsive records.[2]

**D. The FBI Contacted Subject Matter Experts**

As explained in the Government's opening brief, the FBI did not limit its search to the PENTBOM file; it also conducted targeted searches of the units that it determined were most likely to possess responsive records due to their connections to the 9/11 investigation and the information provided by Plaintiff. These locations were the NYFO, Counterterrorism Division (CTD), Military Commissions Prosecutions Unit (MCPU), National Security & Cyber Law Branch (NSCLB), and Laboratory Division (LD) Explosive Unit and Evidence Management Unit (EMU). *See* Gov. Br. 5-7; Lara Decl. ¶¶ 23-27. Thus, Plaintiff's assertions that the FBI failed to communicate with FBI employees or officials who may have relevant information, *see* Pl. Br. 2, 12, are simply incorrect.

As part of these targeted searches, the FBI's Record/Information Dissemination Section ("RIDS") (the division within FBI conducting the FOIA search), was in regular email contact with personnel from those offices who had direct first-hand knowledge of the PENTBOM investigation, evidence recovery efforts, and the processing and inventory of evidence. *See* Driver Decl. ¶ 14.

---

[2] *Campbell v. U.S. Dep't of Justice*, cited by Plaintiff is readily distinguishable. In that case, the FBI limited its search to CRS, and discovered information suggesting the existence of documents that it could not locate without expanding the scope of its search, but refused to do so. 164 F.3d 20, 28 (D.C. Cir. 1998). Here, no information has been discovered that suggests that the camera or its contents exist in any particular location. It is only in the "'rare case ... in which an agency record contains a lead so apparent'—*i.e.*, 'a lead that is both clear and certain'—that the agency 'cannot in good faith fail to pursue it'" that courts require additional searches of agency records based on the results of the initial search. *Watkins L. & Advoc., PLLC v. DOJ*, 78 F.4th 436, 449 (D.C. Cir. 2023) (quoting *Kowalczyk v. DOJ*, 73 F.3d 386, 389 (D.C. Cir. 1996)).

Those individuals included the case agents currently assigned to the 9/11 investigation and EMU personnel, the units and personnel who would reasonably be expected to have knowledge of the information sought. *Id.* In addition to RIDS' own efforts, each of these units, offices, and divisions conducted internal reviews of the PENTBOM records, relied upon their unique knowledge of the case, and NYFO and EMU specifically inquired internally if anyone had any knowledge of the camera and its whereabouts. *Id.* This search strategy exceeded the FOIA standard of reasonableness; the law requires nothing more.

E. **The FBI's Search Included Available Evidence Logs and Audits**

As detailed in the FBI's declarations, the FBI's search covered evidence logs and audits that are contained in the PENTBOM file, Lara Decl. ¶ 32; Driver Decl. ¶¶ 15-17, and also included a targeted search of the EMU (the unit that now oversees the location where former Evidence Bay 1284 was located), during which the EMU looked at its more recent evidence audit, *see* Lara Decl. ¶ 31; Driver Decl. ¶¶ 15-16. The EMU's evidence audit is an internal process that the EMU uses to check the accuracy and integrity of its inventory and confirm the accuracy of the evidence logs (which are the official records that are maintained in Sentinel and which were searched as part of the FBI's evidence log searches). *See* Driver Decl. ¶¶ 15-16. Plaintiff speculates that the EMU must have evidence audits from a "more contemporaneous time period" to the 2003 *Baltimore Sun* article and challenges the fact that the FBI fails to explain why it did not search "contemporaneous" EMU evidence audits. Pls. Br. 13. However, EMU does not maintain its internal audits dating back to the time of the 2003 *Baltimore Sun* article. Driver Decl. ¶ 16. Once EMU has completed its internal audits of its holdings and the accuracy of the logs is confirmed, EMU's internal logs are no longer maintained. *Id.* Additionally, EMU formally moved to Quantico in 2004 and Room 1284 was designated as its mail room, thus it was not doing evidence audits at this location at the time

of the *Baltimore Sun* article. FOIA does not require FBI to have done anything more with respect to searching the evidence logs associated with the EMU.

**CONCLUSION**

For the reasons stated above and in the Government's opening brief, the Government's motion for summary judgment should be granted and the Plaintiff's cross motion should be denied.

Dated: New York, New York
July 10, 2026

Respectfully submitted,

JAY CLAYTON
United States Attorney for the
Southern District of New York

By: /s/ Dominika Tarczynska
DOMINIKA TARCZYNSKA
Assistant United States Attorney
86 Chambers Street, 3rd Floor
New York, NY 10007
(212) 637-2748
dominika.tarczynska@usdoj.gov

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Civil Rule 7.1(c), the undersigned counsel hereby certifies that this memorandum complies with the word-count limitation of the Court's individual rules. As measured by the word processing system used to prepare it, this memorandum contains 2,857 words.

*/s/ Dominika Tarczynska*
Assistant United States Attorney