UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JONATHAN WALCZAK,<br><br>Plaintiff,<br><br>v.<br><br>DEPARTMENT OF JUSTICE *et al.*,<br><br>Defendants. | Civil Action No. 25-cv-7741 (PAE) |

**DECLARATION OF CHRISTINA L. DRIVER**

I, Christina L. Driver, declare as follows:

1. I am currently an Assistant Section Chief of the Record/Information Dissemination Section (RIDS), Information Management Division, Federal Bureau of Investigation (FBI), located in Winchester, Virginia, and in the absence of the RIDS Section Chief, I serve as Acting Section Chief for RIDS. I have held this position since June 2026. I joined the FBI in February 1999. Prior to my current position, I served as International Operations Division's Chief Protocol Officer from April 2022 to February 2023, Unit Chief of the International Operations Division's International Protocol Unit from September 2011 to April 2022, Program Manager for the Weapons of Mass Destruction Directorate from August 2008 to September 2011, Protocol Affairs Specialist in the Office of International Operations from October 2004 to August 2008, Research Analyst in IMD from August 2002 to September 2004, and Paralegal Specialist in IMD from February 1999 to July 2002.

2. In my official capacity as Acting Section Chief of RIDS, I supervise eight FBI Headquarters units and two field operational service center units. RIDS's collective mission is to

effectively plan, develop, direct, and manage responses to requests for access to FBI records and information pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. § 552, as amended by the OPEN Government Act of 2007, the OPEN FOIA Act of 2009, and the FOIA Improvement Act of 2016; the Privacy Act of 1974, 5 U.S.C. § 552a; Executive Order 13526; Presidential, Attorney General, and FBI policies and procedures; judicial decisions; and Presidential and Congressional directives. The statements contained in this declaration are based upon my personal knowledge, including information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.

3. Because of the nature of my official duties, I am familiar with the procedures followed by the FBI in responding to requests for information from its files pursuant to the provisions of the FOIA and the Privacy Act of 1974. Specifically, I am familiar with the FBI's handling of the FOIA request submitted by Plaintiff Jonathan Walczak that is the subject of this litigation.

4. Overall, this is the FBI's second, and my first, declaration in this case. This declaration supplements and incorporates the information previously provided in the Declaration of Isabel Marie Lara ("Lara Declaration") dated May 15, 2026 (Dkt. No. 28). The background of this matter is set forth in the prior declaration and will not be fully recounted here. The FBI submits this declaration in further support of Defendant's Motion for Summary Judgment (Dkt. No. 28) and to address the issues raised in the Plaintiff's Memorandum of Law in Support of his Cross-Motion for Summary Judgment and in Opposition to Defendants' Motion for Summary Judgment ("Plaintiff's Opposition") dated June 5, 2026 (Dkt. No. 30).

## THE FBI'S SEARCH FOR RESPONSIVE RECORDS

### THE FBI'S TARGETED SEARCH OF THE NEW YORK FIELD OFFICE

5. In Plaintiff's Opposition, Plaintiff states that the FBI wrongly limited its search of the New York Field Office (NYFO) to records containing the exact phrase "disposable camera"; *see* Plaintiff's Opposition 5-8; however, this assertion is inaccurate.

6. As more fully described in the Lara Declaration at ¶¶ 13-22, RIDS conducted an extensive search of the PENTBOM file in the FBI's Central Records System (CRS). The PENTBOM file is the FBI's centralized record of evidence collected in connection with the 9/11 investigation, and searches within the PENTBOM file encompass all locations where evidence is stored, including holdings at the field offices. *Id.* ¶ 22 n.7. This includes all files from the NYFO.

7. In an attempt to pursue every reasonable lead, RIDS also conducted targeted searches of numerous offices in order to ensure that those offices most directly involved in the collection, maintenance, and review of such records were consulted on the matter. As part of these additional searches, RIDS requested that NYFO conduct searches where it deemed potential records may exist. In response to this outreach, NYFO determined that any such information pertaining to the subject of the request would be contained within the 1B evidence[1] subfile in the PENTBOM case. NYFO conducted a search using the term "digital camera," which resulted in no responsive records located. However, the 1B evidence inventory lists queried by the NYFO are located within the PENTBOM case file housed in Sentinel – the same system that RIDS used during its search efforts. Therefore, even though NYFO limited its search

[1] As explained in the Lara Declaration, 1B evidence is evidence requiring a chain of custody, such as drugs, firearms, cameras, etc. *See* Lara Declaration ¶ 25 n. 15.

only to the specific repository within the PENTBOM file (the 1B subfile) and the term that the NYFO determined was most reasonable, RIDS had also conducted a search of the entire PENTBOM file (which included the 1B evidence subfile) using the twenty-two names and thirty-one search terms described in the Lara Declaration at ¶ 22. As such, any further request to have NYFO conduct additional searches using these terms would be redundant.

THE FBI'S SEARCH TERMS WERE REASONABLY DESIGNED TO LOCATE RECORDS PERTAINING TO THE SUBJECT OF THE FOIA REQUEST

8. As detailed in the Lara Declaration and discussed *supra* at ¶¶ 6-8, the FBI performed extensive searches in its efforts to locate the records requested by Plaintiff by conducting searches of its systems both based on information contained within the four corners of the FOIA request, and by using terms that were based on information provided well after the initial request had been received. Specifically, the FBI identified terms based on the names of twenty-one individuals identified by Plaintiff and thirty-one additional search terms based on information contained in the original request as well as information contained in the *Baltimore Sun* article later provided by Plaintiff. The FBI then conducted searches of the PENTBOM file using these search terms with no resulting responsive records located.

9. In Plaintiff's Opposition, Plaintiff states that the FBI did not conduct searches using broader terms, such as "camera", "film", "photos", "photo", "images", "image", "photograph", "photographs", "picture", "pictures", "footage", and "negatives." *See* Plaintiff's Opposition 8. However, these terms are not designed in such a way as to conduct a reasonable search, particularly when such terms would be used for a text search across the entire PENTBOM file (as FBI did when it searched the twenty-two names and the thirty-one search terms discussed in n the Lara Declaration at ¶ 22). The FBI expects that using the types of terms that Plaintiff is suggesting would lead to identifying as potentially responsive a vast array of

unrelated records, including for example: any file saved as an image; any reference to an image, photo, or picture in interview notes; any documents where agents showed or shared an image or photograph to any potential witnesses and/or other law enforcement personnel; discussions of disposable and non-disposable cameras of all kinds including security cameras, traffic cameras, body cameras, etc. As explained in the Lara Declaration ¶¶ 22 n.7, 29 (a), because the PENTBOM file is the master repository for records of the FBI's expansive investigation of the September 11 attacks, it contains a vast amount of information. Using such general search terms is not feasible.

10. In an effort to provide insight into the substantial number of records that the FBI would need to manually review if such an undertaking was attempted, the chart below shows the number of potentially responsive records that would need to be manually reviewed for each term mentioned:

| Search Term | Number of Potentially Responsive Records |
|---|---:|
| "camera" | 4,843 |
| "film" | 2,814 |
| "photos" | 16,166 |
| "photo" | 27,552 |
| "images" | 2,431 |
| "image" | 3,346 |
| "photograph" | 16,902 |
| "photographs" | 20,931 |
| "picture" | 11,114 |
| "pictures" | 10,916 |
| "footage" | 926 |
| "negatives" | 1,667 |
| **Total** | **119,608** |

THE FBI'S SEARCH OF NAMED PERSONS WAS REASONABLY DESIGNED TO LOCATE RECORDS PERTAINING TO THOSE INDIVIDUALS

11. As described in the Lara Declaration at ¶ 16, the FBI's Central Records System is designed to retrieve information pertaining to indexed individuals, organizations, activities, or events. In Plaintiff's Opposition, Plaintiff asserts that the FBI limited its search to records containing "the full name" of one of the 22 individuals provided. *See* Plaintiff's Opposition 8. The FBI's search was not as narrow as Plaintiff suggests.

12. The FBI conducted searches of the PENTBOM file via the CRS using the full names (including potential middle names and middle initials) of the individuals provided by Plaintiff, which did not locate any responsive records pertaining to the subject of the request. In addition, FBI conducted a manual review of all indexed names associated with the PENTBOM case and, while there are names indexed with missing first or last names in this case, none of those names were consistent with the list of names provided by Plaintiff.

RIDS CONTACTED EXPERTS FAMILIAR WITH THE 9/11 INVESTIGATION IN AN ATTEMPT TO FOLLOW REASONABLE LEADS

13. In Plaintiff's Opposition, Plaintiff asserts that the FBI failed to take "reasonable steps to ascertain who within the agency might have relevant information, like identifying such employees or sending a simple email to the New York Field Office." *See* Plaintiff's Opposition at 2. Plaintiff further asserts that FBI "did not reach out to any other FBI officials, including those with personal involvement." *Id.* at 12. Those are inaccurate characterizations of the steps that FBI undertook in its search.

14. In conducting its targeted searches of New York Field Office (NYFO), Counterterrorism Division (CTD), Military Commissions Prosecutions Unit (MCPU), National Security & Cyber Law Branch (NSCLB), and Laboratory Division (LD) Explosive Unit and

Evidence Management Unit (EMU), RIDS was in regular email contact with personnel from those offices who had direct first-hand knowledge of the PENTBOM investigation, evidence recovery efforts, and the processing and inventory of evidence. Those individuals included the case agents currently assigned to the 9/11 investigation and EMU personnel, the units and personnel who would reasonably be expected to have knowledge of the information sought. In addition to RIDS' own efforts, each of these units, offices, and divisions conducted internal reviews of the PENTBOM records, relied upon their unique knowledge of the case, and NYFO and EMU specifically inquired internally if anyone had any knowledge of the camera and its whereabouts. No potentially responsive records were located as a result of these searches and no further leads were uncovered.

RIDS HANDLING OF EVIDENCE LOGS AND EVIDENCE AUDITS

15. In response to the portion of the Court's January 21, 2025 Order, asking the FBI to "[d]etermine whether the requested materials are or were contained in Evidence Bay 1284 at the FBI's headquarters in Quantico, Virginia," a location that had been referenced in the *Baltimore Sun* article, Dkt. No. 20 ¶ 3, in the Lara Declaration, the FBI explained that the location that once housed Evidence Bay 1284 was no longer used for storing evidence and that the Laboratory Division's EMU, which overseas the location, was included in the FBI's targeted search. Lara Declaration ¶ 31. The FBI further explained that the EMU has an internal process for checking the accuracy of its inventory through an internal audit process, and that the camera was not observed as being in the EMU's holdings in the most recent audit, in August 2025. *Id.* In Plaintiff's Opposition, Plaintiff states that "given that EMU 'regularly conducts evidence audits,' *id*., it stands to reason that evidence audits from a more contemporaneous time period

would exist" and should have been searched by the FBI. *See* Plaintiff's Opposition 13. That statement is inaccurate.

16. As explained in the Lara Declaration ¶ 31, EMU advised RIDS that it conducts regular evidence audits as an internal measure to ensure the accurate and integrity of its holdings; however, EMU was unable to locate any records responsive to the subject of the FOIA request. EMU does not maintain its internal audits dating back to the time of the 2003 *Baltimore Sun* article. EMU's evidentiary holdings are identified in evidence logs, which are the official record maintained in Sentinel (and which was searched as part of the searches of evidence logs below). The evidence audits are an additional document that serves as an internal measure to confirm the accuracy of those logs. Once EMU has completed its internal audits of its holdings and the accuracy of the logs is confirmed, EMU's internal audits are no longer maintained. Notably, EMU formally moved to Quantico in 2004 and Room 1284 was designated as its mail room.[2]

17. RIDS also conducted a search of Sentinel, which included searching evidence logs. As a general matter, Field Offices maintain and perform an additional separate set of audits of their evidence holdings and these are maintained within Sentinel. Such evidence audits, and evidence logs, related to the PENTBOM investigation were included in the FBI's search within Sentinel. However, as a general matter, these records rarely include descriptive information and merely reference the evidence numbers associated with a piece of evidence. These evidence numbers are linked to the object's recovery information; however, if the FBI is unable to locate the originating serial or any other record pertaining to the subject requested, there is no way to

[2] While the *Baltimore Sun* article mentions Evidence Bay 1284 in its opening line, and discusses the disposable camera and photos that Plaintiff seeks towards the end of the article, the article does not specifically state that the requested camera, film or photos were housed in that location. *See* Lara Declaration Exhibit C, Dkt No. 28-3, at 7, 10.

identify the evidence number to cross reference it in the FBI's evidence logs. During its search in this case, the FBI located potentially responsive records, reviewed evidence logs, and determined that the potentially responsive records were not responsive to the subject of the request. No additional leads were found that would have to facilitated further queries of the evidence logs maintained in Sentinel.

**CONCLUSION**

18. The FBI performed adequate and reasonable searches for records and was unable to locate any responsive records subject to the FOIA.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

CHRISTINA DRIVER

Digitally signed by CHRISTINA DRIVER
Date: 2026.07.08 16:26:21 -04'00'

Christina L. Driver
Acting Section Chief
Record/Information Dissemination Section
Information Management Division
Federal Bureau of Investigation
Winchester, Virginia