**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JONATHAN WALCZAK,<br><br>Plaintiff,<br><br>v.<br><br>U.S. DEPARTMENT OF JUSTICE and FEDERAL BUREAU OF INVESTIGATION,<br><br>Defendants. | Case No. 25-cv-7741 (PAE) |

**PLAINTIFF'S REPLY IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

Defendants still fail to demonstrate an adequate search for photos depicting a singular view of a central moment in American history. Because there is no dispute that the FBI possessed the photos at one point, one of four things must be true: (1) it no longer has them; (2) it looked in the wrong place; (3) it used search terms that do not match how investigators described the photos in the FBI's evidence inventory; or (4) investigators did not properly catalogue them. The FBI has not shown that it no longer possesses the photos, and there remain reasonable steps for the FBI to take to address the other three possibilities, described further below.

First, Defendants clarify in their supplemental declaration that, after searching their Central Record System ("CRS"), they consulted the New York Field Office ("NYFO") for assistance. The NYFO then searched a more targeted subfile in the CRS, an evidence "inventory," using a single term, "disposable camera." This is problematic because shortly before the September 11 attacks, the FBI Laboratory—including the Explosives Unit, which handled the photos—was found by the DOJ Inspector General to have poor inventorying practices. The NYFO should have searched its physical holdings instead of duplicating, with a single term, a CRS search of an unreliable inventory, one already conducted by Defendants.

Second, Defendants misrepresent, and thus fail to rebut, Walczak's argument that they should have expanded their search of the 9/11 case file to include other terms. They argue that the terms Walczak proposed would be unduly burdensome. But Walczak never insisted that Defendants were required to search the entire 9/11 case file using all the terms he provided, without further constraints. Rather, those terms are a starting point for a reasonable search, and Walczak has no objection to further narrowing discussions. It would be premature to cut off the search until these reasonable avenues have been pursued.

Third, Defendants represent that they contacted a number of relevant individuals within the FBI who could potentially have leads as to the photos: either where they might be or how they might have been described. But they fail to explain why they did not contact the person most likely to have a lead—Donald Sachtleben—and indeed have likely spent more time opposing this outreach than it would have taken to conduct it. Tracking him down would be trivial, as his address is a matter of public record, and he is the only individual to have interacted with the photos within the FBI.

The Court should grant Walczak summary judgment and order an adequate search.[1]

## II. ARGUMENT

### A. The New York Field Office search is still inadequate.

In his opening brief, Walczak argued that Defendants wrongly limited their search of the NYFO to the single phrase "disposable camera," and instead should have searched the NYFO using the same search terms as the 9/11 case file, PENTTBOM.[2] *See* Pl. Br. at 5-8, ECF No. 30. In response, Defendants do not claim that "disposable camera" was an adequate search string—and indeed, their supplemental declaration avers that the search used the phrase "digital camera," not "disposable camera," which would be even more deficient given that the camera at issue was disposable. *See* Driver Decl. ¶ 7, ECF No. 35. Instead, they argue that ordering a further search

---

[1] In light of the FBI's supplemental declaration, Walczak no longer presses the remaining two arguments from his opening brief: that the FBI should have taken additional steps to inquire internally as to the photos, and that it should have searched contemporaneous evidence audits from Evidence Bay 1284. In the former case, Defendants have now explained the outreach they conducted. Driver Decl. ¶ 14, ECF No. 34. In the latter, Defendants have represented that the FBI no longer maintains audits from the relevant time period. *Id.* ¶ 16.

[2] Defendants misspell the acronym of this case file, PENTTBOM, short for "Pennsylvania, Pentagon, and Twin Towers Bombing." *See* 9/11 Investigation, *Federal Bureau of Investigations*, https://www.fbi.gov/history/cases-and-criminals/911-investigation. Walczak retains Defendants' incorrect acronym while citing their filings.

of the NYFO would be "redundant" because the particular subfile the Office searched is housed in the broader PENTTBOM file, which has already been searched using the broader string. *See id*.

Whether or not the supplemental declaration addresses Walczak's initial argument, it raises a new issue: the NYFO did not search any physical holdings. As the supplemental declaration clarifies, the Office searched only "inventory lists" of one of the PENTTBOM subfiles. Driver Decl. ¶ 7. A search only of the inventory list, however, is problematic in this particular circumstance. According to Defendants' first declarant, the NYFO's holdings include those that were transferred by the Explosives Unit, the unit that handled the camera at issue. *See* Lara Decl. ¶ 25, ECF No. 28; *see also* Lara Decl. Ex. C at 7, 10, ECF No. 28-3. Yet the FBI Laboratory, of which the Explosives Unit was a component, was found by the DOJ Inspector General in 1997 to have inadequate inventorying practices. *See* Michael R. Bromwich, Inspector General, The FBI Laboratory: An Investigation into Laboratory Practices and Alleged Misconduct in Explosive-Related and Other Cases, *DOJ Office of Inspector General*, 8 (Apr. 1997), https://www.prisonlegalnews.org/media/publications/fbi%20crime%20lab%20doj%20ig%20report%201997.pdf ("1997 OIG Report") (noting that the report's findings "primarily concerned three units of the FBI Laboratory," including the Explosives Unit). In particular:

> Laboratory personnel whom we interviewed were nearly unanimous in criticizing the existing system for retaining case files. Many examiners observed that they retained notes or data themselves because they were not confident they could later be retrieved from the central file unit. Many files we reviewed either referred to documents that could not be found or were otherwise visibly incomplete.

*Id*. at 582-83.

Given the significant, near-contemporaneous inventorying problems in the very FBI component at issue here, it was not reasonable for Defendants to rely solely on inventory lists to search for the photos. They also should have searched physical evidence holdings that could plausibly contain them. The Court should order them to do so. Walczak does not have sufficient

information about the FBI's recordkeeping to identify the holdings that should be searched, but is willing to work with Defendants to craft an appropriately tailored methodology. The Court should grant summary judgment to Walczak and order the parties to confer.

### B. Defendants used inadequate terms to search the 9/11 case file and have not shown that a further search would unduly burden them.

Walczak argued in his opening brief that the FBI's search terms were too narrow because they largely parroted phrases from the *Baltimore Sun* article, like "friends at a birthday party," "chilling chronology," and the like, that would not likely have been used by investigators to describe the photos. *See* Pl. Br. at 8-9. He then proposed an exemplary set of search terms that would have been reasonable, while allowing that those terms might "need[] to be further narrowed," and suggested that the Court order the parties to confer if Defendants contend his suggested terms are too burdensome. *Id*. at 8. He also argued that Defendants' undue burden claims were too speculative to satisfy the applicable standards. *See id*. at 9.

Defendants respond in three ways. First, they argue that agencies have discretion in crafting search terms. *See* Def. Opp. at 3-4, ECF No. 34. Yet as Walczak has already shown, that discretion is not absolute, and Defendants have not concretely explained why their search terms would likely locate the photos. *See* Pl. Br. at 6-7 (citing cases regarding agencies' discretion on search terms); *id*. at 8-9 (explaining why Defendants' search terms were inadequate).

Second, Defendants complain that Walczak's proposed terms "would identify as responsive a vast array of records unrelated to the camera and its contents." Def. Opp. at 4. But the prospect of unearthing many nonresponsive documents is "not a relevant concern under FOIA" unless the search would impose an undue burden on the agency. *Knight First Amend. Inst. at Columbia Univ. v. Centers for Disease Control & Prevention*, 560 F. Supp. 3d 810, 824 (S.D.N.Y. 2021).

Third, Defendants now purport to quantify the burden that would arise from Walczak's proposed search terms. They claim that a search of the PENTTBOM case file using Walczak's exemplary list results in 119,608 hits. Driver Decl. ¶ 10. As an initial matter, this number appears inflated. Defendants do not claim to have deduplicated those records either against each other or against those they have already reviewed. And there is likely a substantial overlap with respect to both sets. For instance, many documents containing the term "camera" would likely also contain the term "photo," both of which are on Walczak's exemplary list. *See id*. And clearly, documents containing the term "last picture," which Defendants have already reviewed, will also contain the term "picture," which Walczak proposed. *See id*.; *see also* Lara Decl. ¶ 22. Other examples abound. It is therefore unclear from Defendants' supplemental declaration how many new and unique documents Defendants would actually need to review.

In any event, as explained above, Walczak has never insisted that the FBI must search the entire PENTTBOM case file for all those search terms without further constraints. It may be reasonable, for instance, to limit any supplemental search to documents created before a certain date, such as a short time after the publication of the *Baltimore Sun* article. It may be reasonable to limit the search to documents contained in certain parts of the PENTTBOM case file. Those could include the 1B subfile, which the NYFO apparently believed to be a reasonable search location, *see* Lara Decl. ¶ 25, a subfile for "1A" documents, which (unlike 1B documents) include photographs not requiring chain of custody to be tracked, *see* Glenn A. Fine, Inspector General, An Investigation of the Belated Production of Documents in the Oklahoma City Bombing Case, *DOJ Office of Inspector General*, 23 (Mar. 19, 2002) https://oig.justice.gov/sites/default/files/archive/special/0203/report.pdf ("2002 OIG Report"), or any other pertinent Explosives Unit holdings. And it may also be reasonable to include other

secondary search terms to reduce the number of hits. Where, as here, there remain feasible steps to narrowing, it is premature to find an undue burden. *See Heritage Found. v. U.S. Dep't of Homeland Sec.*, No. 1:22-cv-03186, 2026 WL 734061, at *3-4 (D.D.C. Mar. 16, 2026) (declining to find undue burden, and ordering further conferrals, after concluding that potentially feasible steps remained to narrowing a universe of 300,382 potentially responsive pages). The Court should hold that Defendants employed inadequate search terms and order the parties to confer about further reasonable searches for the historically significant photos at issue in this case.

**C. Defendants should have attempted to contact Sachtleben.**

In his opening brief, Walczak argued that Defendants should have contacted a former Special Agent, Donald Sachtleben, who was interviewed about the responsive photos as part of the *Baltimore Sun* article and refused to provide information about them to Walczak because the FBI had not authorized it. Specifically, he argued that Sachtleben, who personally interacted with the photos, was reasonably likely to have information that would enable the FBI to locate them, such as how they might have been described internally. *See* Pl. Opening Br. at 9-12. Defendants respond that FOIA "does not require the FBI to go to such great lengths collecting clues as to where a single item requested by a FOIA request might be." Def. Opp. at 6.

Defendants, however, overstate the lengths to which contacting Sachtleben would require them to go. Finding Sachtleben is easy: his address is a matter of public record.[3] And contacting him would require no more than a short letter or phone call, or some similar good-faith effort. This could likely be accomplished in less than an hour, and to the extent Walczak's participation might help reduce the already-minimal burden on Defendants, he is willing to provide it. This serves to

[3] https://www.icrimewatch.net/offenderdetails.php?OfndrID=10698740&AgencyID=54835.

distinguish Defendants' lead case on the point, where the former employees "may be difficult to contact or deceased." *Blanton v. U.S. Dep't of Just.*, 182 F. Supp. 2d 81, 86 (D.D.C. 2002).

Despite contesting the reasonableness of contacting Mr. Sachtleben, Defendants do not dispute that a reasonable search can require contacting potentially knowledgeable individuals. Indeed, they claim to have done so: they state that the FBI "was in regular email contact with personnel … who had direct first-hand knowledge of the PENTBOM investigation, evidence recovery efforts, and the processing and inventory of evidence." Driver Decl. ¶ 14. Defendants would have the Court draw a bright line between current agency employees (fair game) and others (verboten). But they offer no principled basis for that bright line rule, which is generally inappropriate in FOIA searches. *See Whitaker v. Dep't of Com.*, 970 F.3d 200, 208 (2d Cir. 2020) (rejecting proposed "unifying principle" in FOIA search case in favor of a "broader rule that an agency need not conduct a search that it has reasonably determined would be futile"). In the typical case, to be sure, contacting outside individuals will not be warranted. Often, it may be burdensome to locate them, or their knowledge would be duplicative of current agency employees. But as shown above, contacting Sachtleben would not be burdensome. And neither is his knowledge likely duplicative of what the agency possesses internally. While Defendants claim to have contacted individuals familiar with the PENTTBOM investigation and its evidence more generally, *see* Driver Decl. ¶ 14, they do not claim that any of those individuals had any knowledge of the photos at issue in this case, unlike Sachtleben, who personally interacted with and gave a public interview about them. He therefore likely possesses information current agency employees do not, including how they might have been described by investigators who used them, himself included.

Defendants last chide Walczak for not citing a case where a court required an agency to contact a former employee. *See* Def. Opp. at 6-7. But Defendants cite no case supporting their absolute proposition either. The absence of many cases on this issue likely reflects the rarity with which FOIA requesters have argued that such consultations are necessary. It has no bearing on whether contacting a former employee, like Sachtleben, can be part of a reasonable search in some cases. As explained above and in Walczak's opening brief, it is here.

## III. CONCLUSION

For the foregoing reasons, the Court should grant summary judgment to Plaintiff, deny summary judgment to Defendants, and order Defendants to address the deficiencies in their search.

Dated: July 24, 2026

Respectfully submitted,

*/s/ Stephen Stich Match*

Stephen Stich Match (5567854)
LOEVY & LOEVY
222 Sutter Street, Suite 600A
San Francisco, CA 94108
(312) 243-5900
match@loevy.com
foia@loevy.com

Merrick Jason Wayne (*pro hac vice*)
LOEVY & LOEVY
311 North Aberdeen, 3rd Floor
Chicago, IL 60607
(312) 243-5900
foia@loevy.com

*Attorneys for Plaintiff*